**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNEAPOLIS**

---

**TIME WARNER CABLE, INC., a**
**Delaware Corporation, d/b/a**
**Time Warner Cable; and KBL**
**CABLESYSTEMS OF MINNEAPOLIS,**
**L.P., a limited partnership d/b/a**
**Time Warner Cable,**

      **Plaintiffs,**

v.                                             **MEMORANDUM OF**
                                               **LAW AND ORDER**
                                               **Civil File No. 06-484 (MJD/AJB)**

**CITY OF MINNEAPOLIS, a**
**Minnesota Municipal**
**Corporation,**

      **Defendant.**

---

Henk Brands, Paul, Weiss, Rifkind, Wharton & Garrison, and Randall Tietjen and Stephen P. Safranski, Robins, Kaplan, Miller, & Ciresi LLP, on behalf of Plaintiffs.

C. Lynne Fundingsland and Lisa M. Needham, Minneapolis City Attorney's Office, on behalf of Defendant.

---

**I.**   **INTRODUCTION**

This case is before the Court on Plaintiffs' Motion for Permanent Injunction Against Retaliation [Doc. No. 15]. Oral argument was heard on April 12, 2006.

1

## II.    BACKGROUND

### A.    <u>Cable Operators' Relationship with the Municipalities They Serve</u>

The-rights-of-way cable operators access to bury cable and string wires on utility poles are controlled by municipalities, which are commonly referred to as local franchising authorities ("LFAs"). LFAs will not allow cable operators to use rights-of-way without permission. The permission is called a "franchise" and is considered both a private agreement and a public ordinance. 47 U.S.C. § 522(9); Franchise Agree. Art. III § 13(10). Title VI of the Communications Act, 47 U.S.C. § 521 <u>et</u> <u>seq.</u>, protects cable operators and their subscribers.

### B.    <u>The Parties' Relationship Prior to the Initiation of This Lawsuit</u>

In 1979, the City of Minneapolis ("the City") awarded a franchise to Northern Cablevision, which was eventually acquired by Paragon Cable, Defendants' predecessor-in-interest (collectively "Time Warner"). That franchise expired in 2004, and the Parties are currently operating under the expired franchise on a temporary basis.

Under the Franchise Agreement, the City may assess monetary penalties for material violations of the Agreement. If Time Warner disputes alleged violations, it must notify the City in writing and the City Council must hold public hearings and determine if there is reason to believe Time Warner violated the Franchise Agreement. Likewise, if the City determines that Time Warner has substantially

violated any provision of the Franchise Agreement, the City may make written demand upon Time Warner that it remedy the violation and notify Time Warner that a continued violation may be cause for termination of the franchise. If the violation is not remedied within thirty days following such notice, the City must determine if the violation was excusable or inexcusable under the Franchise Agreement. The City must then conduct a public hearing on the issue and Time Warner shall have the opportunity to be heard.

In April 2005, Time Warner announced plans to transfer its rights under the Franchise to the Comcast Corporation and the City passed a resolution conditionally granting the application for transfer of ownership.[1]

### C.   **Administrative Proceedings Prior to City of Minneapolis v. Time Warner Cable, Inc.**

According to the City, on February 20, 2002, Time Warner Cable requested in writing that the City commence renewal proceedings on the Parties' Franchise Agreement as required under 47 U.S.C., § 546.1. (Def. Mem. Opp. Mot. Perm. Inj. at 2.) That statute provides, in pertinent part, that upon a cable operator's request for renewal, the franchising authority must commence proceedings that allow the public the opportunity to assess how well the cable operator has

---

[1] In its opposition, the City states that Time Warner and Comcast did not satisfy the conditions precedent for final approval, and therefore the City's conditional approval of transfer became a denial. (Def. Mem. Opp. Mot. Perm. Inj. at 11.)

complied with the terms of the franchise agreement. 47 U.S.C. § 546(a)-(c). The Parties' Franchise Agreement also makes this review mandatory. (Franchise Agree. Art. V § 1(b),(c).)

The City asserts that as a result of its review of Time Warner's performance in conjunction with Time Warner's request for renewal, it determined that Time Warner's performance under the Franchise Agreement had been deficient, and issued a notice giving Time Warner an opportunity to cure pursuant to 47 U.S.C. §546(d) and the Franchise Agreement. (Def. Mem. Opp. Mot. Perm. Inj. at 2-3.) Included in the notice were the capacity claim and failure to provide an institutional network ("I-net") claim that are currently the subject of administrative proceedings before the City Council. According to the City, Time Warner Cable chose not to cure, and therefore the City initiated the franchise enforcement procedure set forth in the Franchise Agreement. (Id. at 3.) City Communications Officer Gail Plewacki states that she attempted to resolve the outstanding issues without issuing violations, but that those attempts were unsuccessful, and Plewacki finally did issue violations against Time Warner. (Plewacki Aff. ¶¶ 15-16.) The violation notices alleged that Time Warner did the following:

> [1] [failed] to provide a state-of-the-art [I-net] network as required under the Franchise Agreement . . . [;]
>
> [2] fail[ed] to dedicate system capacity for public use as required

4

>under the Franchise Agreement . . .[;]
>
>[3] construct[ed] . . . facilities unnecessary to the operation of a cable communications system . . . [;] [and]
>
>[4] [failed] to conduct annual opinion surveys as required under the Franchise Agreement.

(Id. ¶ 103.)  The notices regarding system capacity and improper facilities construction are dated April 21, 2005.  (Id. Ex. 85, 86.)  The notice regarding the I-net violation is dated June 14, 2005, and the notice regarding opinion surveys is dated July 25, 2005. (Id. Ex. 84, 87.)  The notices cited Article III of the Franchise Agreement, which addresses breaches of the Agreement, not Article V, which addresses renewal procedures.  (Roden Decl. Ex. B-E.)  Time Warner disputed the allegations contained in the violation notices.

On May 18, 2005, the City notified Time Warner that it had scheduled a public hearing before the City Council's Ways and Means Committee to address the alleged franchise violations for failure to dedicate requisite system capacity and for the construction of unnecessary facilities.  (Id. ¶ 105.)  The Parties agreed to continue this hearing until a later time.

### D. City of Minneapolis v. Time Warner Cable, Inc.

On May 23, 2005, the City filed a lawsuit against Time Warner in Minnesota state court alleging, among other things, that Time Warner breached its cable franchise with the City in two ways.  City of Minneapolis v. Time Warner Cable,

Inc., No. 05-CV-994 (ADM/AJB), 2005 WL 3036645 (D. Minn. Nov. 10, 2005). First, the City claimed that Time Warner breached the franchise by failing to pay the City five percent (5%) of revenue derived from cable modem service as required by the Franchise Agreement.  Second, the City claimed conversion of channel capacity on Time Warner's cable system.  Specifically, the City claimed that under the Franchise Agreement, the City was entitled to demand twenty-five percent of Time Warner's capacity for purposes of the City's choice.  The City never amended its complaint to include the other alleged breaches of the Franchise Agreement.

Time Warner removed that case to the Federal District Court for the District of Minnesota where the Honorable Ann D. Montgomery denied the City's motion to remand and granted Time Warner's motion to dismiss the City's complaint. **See id. at xx.**  Judge Montgomery reasoned that "[t]he FCC and numerous courts have found that under the Telecommunications Act, Congress intended that cable modem service revenues are not to be included in the assessment of franchise fees." Id. at 6.  Judge Montgomery also found that the City's capacity claim was barred by the statute of limitations.  Specifically, Judge Montgomery found that under the City's theory of the case, Time Warner had "been converting channel capacity for over twenty years" and therefore the claim was time barred. Id. at 7. Judge Montgomery also reasoned that "'[w]here the gravamen of the complaint is

the breach of contract, a cause of action for conversion will not lie'" and that "it is not clear 'system capacity' is the type of property that can be converted." Id. n.4. The City has appealed Judge Montgomery's decision to the Eighth Circuit Court of Appeals.

### E. Administrative Proceedings Subsequent to the Filing of City of Minneapolis v. Time Warner Cable, Inc.

On July 1, 2005, the City notified Time Warner that it had scheduled a public hearing before the City Council's Ways and Means Committee to address the franchise violations for failure to provide a state-of-the-art institutional network. On July 26, 2005, the City notified Time Warner that it had scheduled a public hearing before the City Council's Ways and Means Committee to address the franchise violations for failure to provide a state-of-the-art institutional network, failure to dedicate system capacity, and for construction of unnecessary facilities. The hearings on all alleged franchise violations were eventually rescheduled for December 19, 2005. (Id. ¶¶ 109-13.) The penalties associated with these alleged violations could total over $100 million. (Compl. ¶ 34.)

The Parties agreed to reschedule the public hearings until February 6, 2006, after the election of a new Ways and Means Committee. These hearings were entitled "In Re: Time Warner Cable Franchise Violations." (Roden Aff. Ex. Q at 1.) At the beginning of the hearing, Cable Communications Officer's Representative Mike Bradley said that the purpose of the hearing was to "determine whether

there is reason to believe Time Warner Cable . . . has committed a vilation of the cable franchise agreement." (Id. at 4.)  However, during the hearing Pam Colby, executive director of the Minneapolis Health Communications Network, stated that her organization had conducted a "renewal needs assessment" that was requested by the City.  (Id. at 8.)  Ms. Colby expressed concern that the City was currently working on a "request for renewal proposal," that the City had not contacted her organization about this process, and that her organization believed that it and the City should work together on "franchise renewal efforts."  (Id.)  While there are numerous references to "violations" in the administrative hearing transcript (Roden Aff. Ex. X), there are no other references to the renewal process.

## III.    DISCUSSION

In this declaratory judgment action, Time Warner seeks a declaration that the City's four assertions of breach are without merit.  Time Warner asserts that by conducting administrative hearings and issuing violations, the City is trying to illegally extract money from Time Warner for violations of the Franchise Agreement, and that the current proceedings have nothing to do with renewal or transfer of the franchise.  Time Warner asserts that the City has offered to settle the dispute, thus disproving the City's argument that the proceedings are merely transfer or renewal proceedings.

The City responds that it is merely using the procedures contained in the Franchise Agreement to determine if Time Warner breached the Agreement. The City proffers that this determination is vital because in its Resolution Conditionally Granting the Application of Comcast Corporation, the City stated that Comcast would be liable for all of Time Warner's franchise violations and noncompliance issues. (Resolution §§ 1.1, 1.2.) Therefore, according to the City, it is important for it to know what violations have occurred so that it can require Comcast to assume responsibility for those outstanding violations. In addition, the City argues that federal law requires it to conduct administrative hearings when deciding whether renewal is appropriate.

Time Warner filed the instant motion for injunctive relief contending that the decision in City of Minneapolis requires this Court to enjoin the hearing proceedings on all four issues currently before the City Council. The City does not agree.

### A.   Whether the Franchise Agreement's Forum Selection Clause Makes Litigation in Federal Court Inappropriate

The Franchise Agreement's forum selection clause provides that the Parties "consent to, and submit to, the laws, jurisdiction and courts of the State of Minnesota." (Franchise Agree. Art. I § 24.) The City argues that this clause mandates that all litigation over the Franchise Agreement be conducted in Minnesota state courts. Time Warner responds that the clause is permissive rather

than mandatory, and therefore the federal court for the District of Minnesota is a proper forum for litigation.

The Court cannot entertain the Parties' arguments because relitigation of this issue is barred by the doctrine of issue preclusion based on Judge Montgomery's decision in <u>City of Minneapolis</u>.  The parties argued this very issue before Judge Montgomery, and she concluded that he clause was permissive rather than mandatory, and therefore, remand was not required.  <u>City of Minneapolis</u>, 2005 WL 3036645, at *5.

Under the doctrine of collateral estoppel or issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980); <u>Simmons v. O'Brien</u>, 77 F.3d 1093, 1095 (8th Cir. 1996).  By precluding parties from arguing matters they already had a full and fair opportunity to litigate, the cost and vexation of subsequent lawsuits is avoided; judicial resources are conserved; and the possibility of inconsistent decisions is prevented.  <u>Id.</u>

Issue  preclusion applies when: (1) the party sought to be precluded was a party, or in privity with a party, to the prior lawsuit; (2) the issue sought to be precluded was the same as in the prior lawsuit; (3) the issue was actually litigated in the prior lawsuit; (4) the issue was determined by a valid and final judgment;

and (5) the determination in the prior lawsuit was essential to the prior judgment. Anderson v. Genuine Parts Co., Inc., 128 F.3d 1267, 1273 (8th Cir. 1997). In this case, all the elements are met. Judge Montgomery interpreted this same clause and concluded it was permissive. This conclusion was essential to the judgment in City of Minneapolis. Therefore, the doctrine of collateral estoppel bars further litigation of the issue, and the case is properly before the Court. This is true, even if this Court might have decided the issue differently. See Clark v. Clark, 984 F.2d 272, 273 (8th Cir. 1993) (stating that the doctrines of claim and issue preclusion "prevent relitigation of wrong decisions just as much as right ones"). Therefore, the Court must consider the Parties' other arguments.

  **B.** **Whether the Court Has the Ability to Enjoin the Administrative Proceedings**

The Anti-injunction Act provides that a federal court "may not grant an injunction to stay proceedings in a state <u>court</u> except as expressly authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgment." 28 U.S.C. § 2283 (emphasis added). The purpose of the rule is to prevent "unnecessary friction between state and federal courts." Entergy, Arkansas, Inc. v. Nebraska, 210 F.3d 887, 900 (8th Cir. 2000). Although the Parties sometimes rely on Anti-injunction Act cases in their briefs, the Anti-injunction Act does not apply to state administrative proceedings. See id. at 900. The Act does not apply to state administrative proceedings because administrative

proceedings have no impact on state courts. See id. The probability that an administrative decision may be appealed to the courts does not change this fact. Id. Since enjoining the administrative proceedings does not implicate any federalism issues, the Court will now address the Parties' other arguments.

### C. Whether Judge Montgomery's Decision in City of Minneapolis Bars the City's Claims

The doctrine of res judicata or claim preclusion is designed to prevent the re-litigation of claims that were or could have been brought in a prior suit between the parties. See Banks v. Int'l Union Electronic, Electrical, Tech., Salaried and Mach. Workers, 390 F.3d 1049, 1052 (8th Cir. 2004). Specifically, res judicata bars a party from asserting a claim that was or could have been raised in a prior action when:

> (1) . . . the prior judgment was entered by a court of competent jurisdiction;
> (2) . . . the prior decision was a final judgment on the merits; and
> (3) . . . the same cause of action and the same parties or their privies were involved in both cases.

Lundquist v. Rice Mem'l Hosp., 238 F.3d 975, 977 (8th Cir. 2001) (citation omitted). To determine if two causes of action are the same for purposes of res judicata, the Court must engage in the following analysis.

> What factual grouping constitutes a "transaction," and what groupings constitute a "series," are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Banks, 390 F.3d at 1052 (quoting Restatement (Second) of Judgments § 24). In short, "a claim is barred by res judicata if it arises out of the same nucleus of operative facts as the prior claim." Id. (citing Lane v. Peterson, 899 F.2d 737, 742 (8th Cir. 1990)). This is true even if the new claim presents evidence or theories that were not presented in the first action. See Lane, 899 F.2d at 744. However, it is also well established that claim preclusion does not apply to claims that did not arise until after the first lawsuit was filed. Lundquist, 238 F.3d at 977 (citation omitted).

The City argues that the administrative proceedings are not a subsequent collateral attack on City of Minneapolis, but rather contract renewal proceedings required by both federal law and the Franchise Agreement. Furthermore, the City avers that "[t]he issues facing the parties here are no mere breach-of-contract disputes, and the hearings must continue in order for the City to determine whether Plaintiff's past performance warrants renewing the franchise." (Def. Mem. Opp. Mot. Perm. Inj. at 10.)

The Court finds that the administrative proceedings are barred by res judicata for two reasons.  First, the Court finds that the capacity conversion issue before Judge Montgomery and the failure to dedicate capacity issue that is the subject of the administrative hearings are the same issue.  Both the complaint in City of Minneapolis and the violation notice rely on the same language from the Franchise Agreement and state that Time Warner failed to dedicate promised system capacity for public use. (Roden Decl. Ex. B ¶¶ 1, 2); City of Minneapolis, No. 05-994 (ADM/AJB), Doc. No. 1 Attach. 1 ¶¶ 23, 28.   Both the complaint in City of Minneapolis and the violation notice state that Time Warner failed to dedicate the capacity it promised under the Franchise Agreement.  City of Minneapolis, No. 05-994 (ADM/AJB), Doc. No. 1 Attach. 1 ¶ 28; (Roden Decl. Ex B. ¶3).

Second, the Court finds that the City could have brought all its breach of franchise claims in City of Minneapolis.  All the claims currently pending before the City Council derive from the same nucleus of operative fact and allege breaches of the same Franchise Agreement.  These breaches existed at the time City of Minneapolis was filed.[2]  The City has not explained why it jumped the gun

---

[2]Although violation notices regarding failure to provide an I-net and opinion surveys were not noticed until after City of Minneapolis was filed, the evidence suggests that the City knew of these alleged violations long before it filed suit in that case.  The I-net issue was included in the June 10, 2004 Notice of Failure to Substantially Comply with City of Minneapolis Cable Franchise. (Plewaki Decl. Ex. 83.)  Moreover, the survey violation was ripe at least as of March 31, 2005, the date the 2005 survey report was due. (Plewacki Decl. Ex. 87.)

14

on its own bargained-for administrative process in order to file a lawsuit on a limited number of claims. It seems that the more prudent practice would have been to let the administrative process play itself out before going to court. By prematurely resorting to the courts, the City forced Time Warner to defend itself in that litigation while still facing the prospect of defending itself at the administrative hearings. The City chose to drag Time Warner into litigation on select issues, and it is unfair to have Time Warner now defend against claims that could have been brought in <u>City of Minneapolis</u>.

Accordingly, the Court finds that the City's claims are barred by res judicata because they either were, or could have been, brought in <u>City of Minneapolis</u>.

### D. <u>Whether Granting the Injunction Will Result in a Violation of Federal Law</u>

The above discussion does not necessarily end the Court's inquiry. Under federal law, LFAs must conduct administrative proceedings when a cable operator submits a proposal for the franchise to be renewed. 47 U.S.C. § 546. The City argues that the administrative proceedings Time Warner wants enjoined are required under this statute. Time Warner responds that the administrative proceedings are not renewal proceedings. Rather, according to Time Warner,

the proceedings merely address alleged violations of the franchise agreement, not the propriety of renewing the franchise.

### E. Whether the Court Should Permanently Enjoin The Administrative Proceedings

Injunctions are extraordinary legal remedies and are granted sparingly. Greater Iowa Corp. v. McLendon, 378 F.2d 783, 799 (8th Cir. 1967).  The party seeking a permanent injunction must show actual success on the merits.  Vonage Holdings Corp. v. Minnesota Pub. Utilities Com'n, 290 F. Supp.2d 993, 996 (D. Minn. 2003) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)).  In addition, the Court should consider (1) the threat of irreparable harm to the moving party; (2) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (3) the public interest in the issuance of the injunction.  Id. (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981) (en banc)).  "The party requesting injunctive relief bears the 'complete burden' of proving all the factors."  Id. (citation omitted).  None of these factors is dispositive – the Court must balance the factors and decide whether or not to grant an injunction.  Id.  Time Warner seeks this injunction and therefore bears the burden to prove all the factors.

#### 1. Success on the Merits

The Court has found that the City's claims are barred by the doctrine of res judicata and therefore the hearings should not continue. Thus, Time Warner has proven success on this issue. This factor weighs in favor of granting the injunction.

### 2. **Threat of Irreparable Harm to Time Warner**

"The expense of prosecuting an action through administrative proceedings does not generally constitute irreparable harm, even if unrecoverable." Entergy, 210 F.3d at 889 (citing FTS v. Standard Oil of Cal., 449 U.S. 232, 244 (1980)). However, an administrative process designed to thwart the exercise of federal rights or that does not provide impartial consideration of the issues can constitute irreparable harm. Id. (finding an injunction appropriate because the state of Nebraska repeatedly used the administrative process to delay its obligations under a multi-state compact and because Nebraska had a demonstrated record of impartiality in that situation).

Time Warner argues that it will be irreparably harmed by participating in the administrative hearings because the City is using the process to deny Time Warner its substantive rights and because the City will not conduct the hearings impartially. Time Warner alleges that the City has appointed itself "prosecutor, judge, jury, and executioner" for the hearings. (Compl. ¶ 32.)

These arguments are without merit. First, the allegation of impartiality is unsubstantiated. This allegation seems to be based on the Parties' disagreement over the interpretation of the Franchise Agreement's procedural protections, an issue best addressed through mediation or litigation, not through an injunction. Second, being required to participate in administrative hearings does not constitute irreparable harm. Third, harm that can be compensated with a later award of money damages is not irreparable. See Minn. Assoc. Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995). If the administrative process were to play itself out and Time Warner was required to pay penalties that a court eventually determines were wrongly assessed, Time Warner could file a suit for money damages. Therefore, this factor weighs against granting the injunction.

### 3. Harm That Granting the Injunction Will Inflict on Other Interested Parties

The City argues that if the injunction is granted, it will be denied the opportunity to fully consider Time Warner's performance under the Franchise Agreement, something it needs to do in order to determine if renewal is appropriate. Time Warner responds that denying the City the opportunity to relitigate issues it already had the opportunity to litigate before Judge Montgomery, but chose not to litigate, is not a harm that the Court must consider.

The Court agrees that the City had the right under the Franchise Agreement and Federal Law to pursue the administrative proceedings provided for in the Franchise Agreement. However, when the City chose to circumvent that process on only two of its claims, it gave up some of those rights. The City cannot have it both ways: it cannot argue that it only intends to uphold its freedom to contract and circumvent that contract at the same time. Therefore, this factor weighs in favor of granting the injunction.

### 4. The Public Interest in the Issuance of the Injunction

The City argues that the citizens of Minneapolis have an interest in having the hearings proceed because they have a right to know if Time Warner lived up to its obligations under the Franchise Agreement. The City also avers that the public rights-of-way that it grants to cable providers must be protected, and the hearing process accomplishes this. Time Warner responds that the public has an interest in maintaining the finality of judicial decisions.

The Court finds that Time Warner has the better argument. While it is true that the citizens of Minneapolis have a right to know if Time Warner breached the Franchise Agreement, it is also true that citizens have an interest in

maintaining the finality of judicial decisions.  This is especially true in this case when the City circumvented the very procedures it is now asking the Court to mandate.

On balance, the Court finds that it must grant Time Warner's motion.  An analysis of the Dataphase factors is an exercise in equity.  See Hubbard Feeds, Inc. v. Animal Feed Supp., Inc., 182 F.3d 598, 601 (8th Cir. 1999).  Under the unique circumstances of this case, the equities weigh in favor of granting Time Warner's injunction.

Unlike most permanent injunctions, this injunction does not end this case.  The Court is still left with a declaratory judgment action.  The Court has not reached the merits of the Complaint – whether Time Warner breached the Franchise Agreement.  The Court has only decided that it would be inequitable to allow the City to go forward with its administrative proceedings.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Permanent Injunction Against Retaliation [Doc. No. 14] is **GRANTED**.

Dated: June 2, 2006

                s / Michael J. Davis
                Michael J. Davis
                United States District Court